# BAILEY *v.* STATE OF ALABAMA.

ERROR TO THE SUPREME COURT OF THE STATE OF ALABAMA.

No. 300. Argued October 20, 21, 1910.—Decided January 3, 1911.

*Prima facie* evidence is sufficient to outweigh the presumption of innocence, and, if not met by opposing evidence, to support a verdict. *Kelly* v. *Jackson*, 6 Pet. 632.

The validity of a statute that authorizes a jury to convict on *prima facie* evidence must be judged by the fact that the jury may convict even if it is not made the duty of the jury to do so.

Although a state statute in terms be to punish fraud, if its natural and inevitable purpose is to punish for crime for failing to perform contracts of labor, thus compelling such performance, it violates the Thirteenth Amendment and is unconstitutional.

A constitutional prohibition cannot be transgressed indirectly by creating a statutory presumption any more than by direct enactment; and a State cannot compel involuntary servitude in carrying out contracts of personal service by creating a presumption that the person committing the breach is guilty of intent to defraud merely because he fails to perform the contract.

While States may, without denying due process of law, enact that proof of one fact shall be *prima facie* evidence of the main fact in issue, the inference must not be purely arbitrary; there must be rational relation between the two facts, and the accused must have proper opportunity to submit all the facts bearing on the issue.

While its immediate concern was African slavery, the Thirteenth Amendment was a charter of universal civil freedom for all persons of whatever race, color, or estate, under the flag.

The words "involuntary servitude" have a larger meaning than slavery, and the Thirteenth Amendment prohibited all control by coercion of the personal service of one man for the benefit of another.

While the Thirteenth Amendment is self-executing, Congress has power to secure its complete enforcement by appropriate legislation and the peonage act of March 2, 1867, and §§ 1990 and 5526, Rev. Stat., are valid exercises of this authority. *Clyatt* v. *United States*, 197 U. S. 207.

A peon is one who is compelled to work for his creditor until his debt

is paid, and the fact that he contracted to perform the labor which is sought to be compelled does not withdraw the attempted enforcement from the condemnation of the peonage acts.

The Federal anti-peonage acts are necessarily violated by any state legislation which seeks to compel service or labor by making it a crime to fail or refuse to perform it.

Although this court may not impute to a State an actual motive to oppress by a statute which that State enacts, it must consider the natural operation of such statute and strike it down if it becomes an instrument of coercion forbidden by the Federal Constitution.

Section 4730 of the Code of Alabama as amended in 1907, in so far as it makes the refusal or failure to perform labor contracted for without refunding the money or paying for property received *prima facie* evidence of the commission of the crime defined by such section, and when read in connection with the rule of evidence of that State, that the accused cannot testify in regard to uncommunicated motives, is unconstitutional as in conflict with the Thirteenth Amendment and of the legislation authorized by it and enacted by Congress.

*Quære*, and not necessary now to decide, whether such section is, under the Fourteenth Amendment, an unconstitutional deprivation of property without due process of law or denial of equal protection of the laws.

161 Alabama, 78, reversed.

THE facts, which involve the constitutionality of § 4730 of the Code of Alabama as construed by the courts of that State and the validity of a conviction thereunder, are stated in the opinion.

*Mr. Fred S. Ball, Mr. Edward S. Watts* and *Mr. Daniel W. Troy* for plaintiff in error, submitted.

*Mr. Assistant Attorney General Harr,* with whom *The Attorney General* was on the brief, by leave of the court, on behalf of the United States as *amicus curiæ:*

The judgment, and the statute upon which it is based, conflict with the Thirteenth Amendment and §§ 1990, 5526, Rev. Stat. See *Clyatt* v. *United States,* 197 U. S.

207, .216, which settled the question, left in doubt by
*Robertson* v. *Baldwin,* 165 U. S. 275, 280. A state penal
statute will be construed by this court as though a rule
of evidence announced by the highest court of the State
as being applicable thereto was incorporated . therein.
Freund, Police Power, § 448.

The act, as amended, is the result of efforts to enforce
labor contracts. See act of March 1, 1901, declared un-
constitutional by the Supreme Court of Alabama, *Toney*
v. *The State,* 141 Alabama, 120; and by the Federal court,
*Peonage Cases,* 123 Fed. Rep. 671, 691.

That act failing, resort was had to the statute here in
question. But first the statute, found ineffective under
*Ex parte Riley,* 94 Alabama, 82, upon the subject of in-
tent, was amended by adding the *prima facie* clause.
*Bailey* v. *The State,* 158 Alabama, 18, 24.

The statute was further amended by the act of Au-
gust 15, 1907 (Gen. Act, Ala., 1907, p. 636), so as to cover
expressly tenants of land, and by changing the penalty so
as to make it peculiarly applicable to contracts with agri-
cultural laborers. For history of this legislation and the
position of the Supreme Court of Alabama in regard
thereto, see *Bailey* v. *State,* 158 Alabama, 18, 22; *Banks*
v. *State,* 124 Georgia, 15; *State* v. *Thomas,* 144 Alabama,
77; *Vann's Case,* 150 Alabama, 66.

Even if the legislature can punish fraudulent practices
in obtaining property by false pretenses under contract
for the performance of an act or service, such object is
clearly distinguishable from one punishing a mere breach
of contract. *Freeman* v. *United States,* 217 U. S. 539. In
whatever language a statute may be framed, its purpose
must be determined by its natural and reasonable effect.
*Henderson* v. *Mayor of New York,* 92 U. S. 268.

In Florida and Mississippi, similar statutes have been
declared void under the Thirteenth Amendment by
United States judges in charges to grand juries; and see

also a similar holding in North Carolina. So also as to the Louisiana act of July 5, 1892, *State* v. *Murray*, 116 Louisiana, 655, though it is manifest that it punishes a mere breach of contract. See records in this court this term in *Harlan* and *Gallagher* y. *McGourin*, 218 U. S. 442.

In construing the Alabama statute the court will bear in mind that the legislature would naturally seek to accomplish by indirection what it could not do directly. But § 1990, Rev. Stat. specifically covers such a case. *Freeman* v. *United States*, 217 U. S. 539, distinguished.

A breach of a contract for personal service upon which advances have been received cannot be made *prima facie* evidence of a fraudulent intent in entering into the contract. *Ex parte Riley*, 94 Alabama, 82; *State* v. *Williams*, 63 S. E. Rep. 949; *Ex parte Hollman*, 79 S. E. Rep. 9; *Vankirk* v. *Staats*, 24 N. J. L. 121; *Adams* v. *New York*, 192 U. S. 585; *Commonwealth* v. *Williams*, 6 Gray (Mass.), 1. *State* v. *Kingsley*, 108 Missouri, 135, holds that it is necessary to establish fraudulent intent before the *prima facie* rule in this statute becomes operative, and see *State* v. *Yardley*, 95 Tennessee, 546, to same effect, that where the only thing shown was a refusal to pay, the fraudulent intent must be proved before the *prima facie* rule could become operative. In this case mere breach of contract is made evidence of the fraudulent intent.

The *prima facie* rule established by the Alabama statute, as shown by this case, is unyielding. The inference under that statute of an intent to defraud from a mere breach of the contract is as absolute when the breach occurs eleven months thereafter as when it occurs one day after the making of the contract.

The judgment in this case, and the statute of Alabama upon which it is founded, are in violation of the Fourteenth Amendment. They deny the defendant the equal protection of the laws. The statute hits especially, as was intended, negro laborers on farms and plantations. Every

reported case under the statute is that of a farm laborer.
The maximum penalty. fixed by the statute, $300; also
makes it peculiarly applicable to this class of laborers.
See *Ex parte Drayton*, 153 Fed. Rep. 986, holding un-
constitutional on those grounds a similar statute of South
Carolina.

Even if the Alabama statute, as originally enacted, was
not to be regarded as class legislation, the subsequent
amendments render it so, and the actual enforcement of
the statute against a single class of laborers alone, denies
equal protection. *Yick Wo* v. *Hopkins*, 118 U. S. 356,
373; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540,
558; *Gulf, Colorado & Santa Fe Ry. Co.* v. *Ellis*, 165 U. S.
151.

Even if the employers of such labor have much to
complain of, it does not relieve the statute of the taint
of unconstitutionality. See Judge Jones' charge to grand
jury in the *Peonage Cases*, 123 Fed. Rep. 691.

Although the legislature may provide that when cer-
tain facts have been proved they shall be *prima facie* evi-
dence of the existence of the main fact, the fact upon which
the presumption is to rest must have some fair relation
to, or natural connection with, the main fact. *People* v.
*Cannon*, 139 N. Y. 32, 43; *State* v. *Beswick*, 13 R. I. 211.

A law which practically shuts out the evidence of a
party, thus denying him the opportunity for a trial, sub-
stantially deprives him of due process of law. *Commis-
sioners* v. *Merchant*, 103 N. Y. 143, 148; *Commonwealth* v.
*Rubin*, 165 Massachusetts, 453; *Kelly* v. *Jackson*, 6 Pet.
622, 631; Greenleaf on Evidence, § 33; *Vankirk* v. *Staats*,
24 N. J. L. 121; *Steinhardt* v. *Beir*, 60 N. Y. Super. Ct.
Rep. 489; *Mooney* v. *LaFollette*, 21 N. Y. App. Div. 510;
*McCormick* v. *Joseph*, 77 Alabama, 236, 240; *Coffin* v.
*United States*, 156 U. S. 432, 453; *State* v. *Thomas*, 144
Alabama, 77, and see *Twining* v. *New Jersey*, 211 U. S.
78, 101, as to the guaranties of due process of law.

*Mr. Alexander M. Garber,* Attorney General of the State of Alabama, and *Thomas W. Martin* for defendant in error:

The statute was designed to punish a certain class of frauds not then punished by any statute.

The original and amended statute has been frequently construed by the Supreme Court of Alabama and the court has consistently held that the purpose of the statute was to punish fraudulent practices and not the mere failure to pay a debt.

The offense is but a species of the common-law crime of cheating by false pretenses, and if in fact the statute does define and punish a crime, there can be no question here of its validity. See for history of the legislation, *Riley* v. *State,* 94 Alabama, 82; *Toney* v. *State,* 141 Alabama, 120; *Peonage Cases,* 123 Fed. Rep. 671, 690, and *Ex parte Drayton,* 153 Fed. Rep. 986, considering a statute of South Carolina.

For decisions involving similar legislation, see *Lamar* v. *State,* 120 Georgia, 312; *State* v. *Williams* (N. C.), 63 S. E. Rep. 949; *Ex parte Hollman,* 79 S. C. 9; *S. C.,* 21 L. R. A. (N. S.) 242. No case can be found from any jurisdiction in which a statute similar to the one under consideration has been held to be invalid.

Unless the original statute is held invalid, there can be no condition of peonage incident to a conviction thereunder. The rule of evidence does not, of itself, or as an amendment to the original statute, make a condition of peonage.

The statute at present is wholly different from the law held invalid in *Toney* v. *State,* 141 Alabama, 120, and in the *Peonage Cases,* 123 Fed. Rep. 671. See *Bailey* v. *State,* 158 Alabama, 18; *State* v. *Vann,* 150 Alabama, 66.

The statute was meant to prevent employés from making fraudulent contracts and to prevent them from obtaining money by promising service. *McIntosh* v. *State,*

117 Alabama, 127. The essential ingredient of the offense is fraud in entering into the contract of employment. If invalid so are all statutes aimed at the obtaining of goods of another by false pretenses. The victim in all such cases has a civil right of action against the party who thus obtains his money. But this fact does not deprive the State of its inherent right to punish the criminal act involved in that transaction.

The Alabama Supreme Court has held that the basal fact is fraud and that the statute does not violate the provision of the state constitution against imprisonment for debt. This construction of the state constitution is conclusive on this court. *Yick Wo* v. *Hopkins,* 118 U. S. 360; *Noble* v. *Mitchell,* 164 U. S. 367. The only question left for determination is whether the statute as thus construed violates the Thirteenth Amendment or the peonage statute. *Mo. Co.* v. *McCann,* 174 U. S. 575; *Am. Steel & Wire Co.* v. *Speed,* 192 U. S. 523. This court cannot hold the law to be violative either of that Amendment, or of the peonage statute except on the theory that it imprisons for a debt. As to what is peonage, see *Clyatt* v. *United States,* 197 U. S. 207; see also *Freeman* v. *United States,* 217 U. S. 539.

The provision of the present statute which provides for a fine in double the damage suffered by the injured party, half to go to the county and the other half to such party, is valid. *Freeman* v. *United States, supra; Re Ebenhack,* 17 Kansas, 615; *Maryland* v. *Nicholson,* 67 Maryland, 1; *State* v. *Yardley,* 95 Tennessee, 546.

The act does not violate the Fourteenth Amendment in that it applies only to persons who enter into contracts for the performance of an act or service or for the rent of land; that it does not bear equally upon the employé and the employer, and that it is applied only against laborers and the colored race. It applies to every person who with a fraudulent purpose enters into a written

contract to perform an act or service for another, and
thereby obtains money.  *Clark* v. *Kansas City*, 176 U. S.
144.

The legislature may establish a *prima facie* rule of evi-
dence in criminal cases.  *Li Sing* v. *United States*, 180
U. S. 485; *Adams* v. *New York*, 192 U. S. 585; *Ah How* v.
*United States*, 193 U. S. 65; *Fong* v. *United States*, 149
U. S. 697, 719; *Commonwealth* v. *Williams*, 6 Gray (Mass.),
1; *State* v. *Beach*, 147 Indiana, 74; *State* v. *Buck*, 120 Mis-
souri, 479; *State* v. *Kingsley*, 108 Missouri, 135; *Meadow-
craft* v. *People*, 163 Illinois, 56; *Barker* v. *State*, 54 Wis-
consin, 368; *Robertson* v. *People*, 20 Colorado, 279; *Voght*
v. *State*, 124 Indiana, 358; *People* v. *Cannon*, 139 N. Y.
32; *Commissioners* v. *Merchant*, 105 N. Y. 148; *Re Mi-
lecke*, 100 Pac. Rep. 743.

The validity of this provision has been upheld by the
Supreme Court of Alabama in *Bailey* v. *State*, 158 Ala-
bama, 18; *State* v. *Vann*, 150 Alabama, 66; *State* v. *Thomas*,
144 Alabama, 77.

The fact that Bailey could not testify to his uncom-
municated motive or intention does not prove that he
was unable to prove his innocence.  If a rule of evidence
which excludes the defendant from testifying as to his
motives has the effect of making the rule of evidence
prescribed by the statute a conclusive rule, it is due to
the particular facts and not to the statute itself.

A *prima facie* rule of evidence in a criminal case does
not overcome the presumption of innocence or change
the burden of proof or require the jury to convict, unless
they are satisfied from all the evidence of the guilt of the
accused beyond a reasonable doubt.  24 Cyc. 192.

The presumption of innocence does not attend a de-
fendant throughout the whole trial but only until suffi-
cient evidence is introduced to overcome the proof which
the law has created.  *Coffin* v. *United States*, 156 U. S.
453; *Martin* v. *State*, 104 Alabama, 78; *Wilson* v. *United*

*States;* 162 U. S. 613; *Considine* v. *United States,* 112 Fed. Rep. 342; *Newson* v. *State,* 107 Alabama, 133, 139.

MR. JUSTICE HUGHES delivered the opinion of the court.

This is a writ of error to review a judgment of the Supreme Court of the State of Alabama, affirming a judgment of conviction in the Montgomery City Court. The statute, upon which the conviction was based, is assailed as in violation of the Fourteenth Amendment of the Constitution of the United States upon the ground that it deprived the plaintiff in error of his liberty without due process of law and denied him the equal protection of the laws, and also of the Thirteenth Amendment and of the act of Congress providing for the enforcement of that Amendment, in that the effect of the statute is to enforce involuntary servitude by compelling personal service in liquidation of a debt.

The statute in question is § 4730 of the Code of Alabama of 1896, as amended in 1903 and 1907. The section of the Code as it stood before the amendments provided that any person who with intent to injure or defraud his employer entered into a written contract for service and thereby obtained from his employer money or other personal property, and with like intent and without just cause, and without refunding the money or paying for the property refused to perform the service, should be punished as if he had stolen it. In 1903 (Gen. Acts, Ala., 1903, p. 345) the section was amended so as to make the refusal or failure to perform the service, or to refund the money or pay for the property, without just cause, *prima facie* evidence of the intent to injure or defraud. This amendment was enlarged by that of 1907. Gen. Acts, Ala., 1907, p. 636. The section, thus amended, reads as follows:

"Any person, who with intent to injure or defraud his

employer, enters into a contract in writing for the performance of any act of service, and thereby obtains money or other personal property from such employer, and with like intent, and without just cause, and without refunding such money, or paying for such property, refuses or fails to perform such act or service, must on conviction be punished by a fine in double the damage suffered by the injured party, but not more than $300, one-half of said fine to go to the county and one-half to the party injured; and any person, who with intent to injure or defraud his landlord, enters into any contract in writing for the rent of land, and thereby obtains any money or other personal property from such landlord, and with like intent, without just cause, and without refunding such money, or paying for such property, refuses or fails to cultivate such land, or to comply with his contract relative thereto, must on conviction be punished by fine in double the damage suffered by the injured party, but not more than $300, one-half of said fine to go to the county and one-half to the party injured. And the refusal or failure of any person, who enters into such contract, to perform such act or service or to cultivate such land, or refund such money, or pay for such property without just cause shall be prima facie evidence of the intent to injure his employer or landlord or defraud him. That all laws and parts of laws in conflict with the provisions hereof be and the same are hereby repealed."

There is also a rule of evidence enforced by the courts of Alabama which must be regarded as having the same effect as if read into the statute itself, that the accused, for the purpose of rebutting the statutory presumption, shall not be allowed to testify "as to his uncommunicated motives, purpose or intention." *Bailey* v. *The State*, 161 Alabama, 77, 78.

Bailey, the plaintiff in error, was committed for detention on the charge of obtaining fifteen dollars under a

contract in writing with intent to injure or defraud his employer. He sued out a writ of *habeas corpus* challenging the validity of the statute. His discharge was refused and the Supreme Court of the State affirmed the order, holding the statute to be constitutional. 158 Alabama, 18. On writ of error from this court it was held that the case was brought here prematurely, and the questions now presented were expressly reserved. *Bailey* v. *Alabama*, 211 U. S. 452.

Having failed to obtain his release on *habeas corpus*, Bailey was indicted on the following charge:

"The Grand Jury of said County charge, that before the finding of this indictment Alonzo Bailey with intent to injure or defraud his employer The Riverside Company, a corporation, entered into a written contract to perform labor or services for The Riverside Company, a corporation and obtained thereby the sum of Fifteen Dollars from the said The Riverside Company, and afterwards with like intent, and without just cause, failed or refused to perform such labor or services or to refund such money against the peace and dignity of the State of Alabama."

Motion to quash and a demurrer to the indictment were overruled. Upon the trial the following facts appeared: On December 26, 1907, Bailey entered into a written contract with the Riverside Company, which provided:

"That I Lonzo Bailey for and in consideration of the sum of Fifteen Dollars in money, this day in hand paid to me by said The Riverside Co., the receipt whereof, I do hereby acknowledge, I, the said Lonzo Bailey do hereby consent, contract and agree to work and labor for the said Riverside Co. as a farm hand on their Scotts Bend Place in Montgomery County, Alabama, from the 30 day of Dec. 1907, to the 30 day of Dec. 1908, at and for the sum of 12.00 per month.

"And the said Lonzo Bailey agrees to render respect-ful and faithful service to the said The Riverside Co. and to perform diligently and actively all work pertaining to such employment, in accordance with the instructions of the said The Riverside Co., or ag't.

"And the said The Riverside Co. in consideration of the agreement above mentioned of the said Lonzo Bailey hereby employs the said Lonzo Bailey as such farm hand for the time above set out, and agrees to pay the said Lonzo Bailey the sum of $10.75 per month.".

The manager of the employing company testified that. at the time of entering into this contract there were present only the witness and Bailey and that the latter then obtained from the company the sum of fifteen dollars; that Bailey worked under the contract throughout the month of January and for three or four days in February, 1908, and then, "without just cause and without refunding the money, ceased to work for said Riverside Company, and has not since that time performed any service for said Company in accordance with or under said contract, and has refused and failed to perform any further service thereunder, and has, without just cause, refused and failed to refund said fifteen dollars." He also testified, in response to a question from the attorney for the defendant and against the objection of the State, that Bailey was a negro. No other evidence was introduced.

The court, after defining the crime in the language of the statute, charged the jury, in accordance with its terms, as follows:

"And the refusal of any person who enters into such contract to perform such act or service, or refund such money, or pay for such property, without just cause, shall be prima facie evidence of the intent to injure his employer, or to defraud him."

Bailey excepted to these instructions, and requested the court to instruct the jury that the statute, and the

provision creating the presumption, were invalid, and further that "the refusal or failure of the defendant to perform the service alleged in the indictment, or to refund the money obtained from the Riverside Co. under the contract between it and the defendant, without cause, does not of itself make out a prima facie case of the defendant's intent to injure or defraud said Riverside Company."

The court refused these instructions and Bailey took exception

The jury found the accused guilty, fixed the damages sustained by the injured party at fifteen dollars, and assessed a fine of thirty dollars. Thereupon Bailey was sentenced by the court to pay the fine of thirty dollars and the costs, and in default thereof to hard labor "for twenty days in lieu of said fine and one hundred and sixteen days on account of said costs."

On appeal to the Supreme Court of the State the constitutionality of the statute was again upheld and the judgment affirmed. 161 Alabama, 75.

We at once dismiss from consideration the fact that the plaintiff in error is a black man. While the action of a State through its officers charged with the administration of a law, fair in appearance, may be of such a character as to constitute a denial of the equal protection of the laws (*Yick Wo* v. *Hopkins*, 118 U. S. 356, 373), such a conclusion is here neither required nor justified. The statute, on its face, makes no racial discrimination, and the record fails to show its existence in fact. No question of a sectional character is presented, and we may view the legislation in the same manner as if it had been enacted in New York or in Idaho. Opportunities for coercion and oppression, in varying circumstances, exist in all parts of the Union, and the citizens of all the States are interested in the maintenance of the constitutional guarantees, the consideration of which is here involved.

Prior to the amendment of the year 1903, enlarged in 1907, the statute did not make the mere breach of the contract, under which the employé had obtained from his employer money which was not refunded or property which was not paid for, a crime. The essential ingredient of the offense was the intent of the accused to injure or defraud. To justify conviction, it was necessary that this intent should be established by competent evidence, aided only by such inferences as might logically be derived from the facts proved, and should not be the subject of mere surmise or arbitrary assumption.

This was the construction which the Supreme Court of Alabama placed upon the statute, as it then stood, in *Ex parte Riley*, 94 Alabama, 82. In that case the court said (pp. 83, 84):

"The ingredients of this statutory offense are: (1) a contract in writing by the accused for the performance of any act or service; (2) an intent on the part of the accused, when he entered into the contract, to injure or defraud his employer; (3) the obtaining by the accused of money or other personal property from such employer by means of such contract entered into with such intent; and (4) the refusal by the accused, with like intent, and without just cause, and without refunding such money, or paying for such property, to perform such act or service. This statute by no means provides that a person who has entered into a written contract for the performance of services, under which he has obtained money or other personal property, is punishable as if he had stolen such money or other personal property, upon his refusal to perform the contract, without refunding the money or paying for the property. A mere breach of a contract is not by the statute made a crime. The criminal feature of the transaction is wanting unless the accused entered into the contract with intent to injure or defraud his employer, and unless his refusal to perform

was with like intent and without just cause. That there was an intent to injure or defraud the employer, both when the contract was entered into and when the accused refused performance, are facts which must be shown by the ,evidence. As the intent is the design, purpose, resolve or determination in the mind of the accused, it can rarely be proved by direct evidence, but must be ascertained by means of inferences from the facts and circumstances developed by the proof. *Carlisle* v. *The State*, 76 Alabama, 75; *Mack* v. *The State*, 63 Alabama, 136. In the absence, however, of evidence from which such inferences may be drawn, the jury are not justified in indulging in mere unsupported conjectures, speculations or suspicions as to intentions which were not disclosed by any visible or tangible act, expression or circumstance.— *Green* v. *The State*, 68 Alabama, 539." See also *Dorsey* v. *The State*, 111 Alabama, 40; *McIntosh* v. *The State*, 117 Alabama, 128.

We pass then to the consideration of the amendment, through the operation of which under the charge of the trial court this conviction was obtained. No longer was it necessary for the prosecution to comply with the rule of the *Riley case* (*supra*) in order to establish the intent to injure or defraud which, as the court said, constituted the gist of the offense. It was "the difficulty in proving the intent, made patent by that decision" which "suggested the amendment of 1903." *Bailey* v. *The State*, 158 Alabama, p. 25. By this amendment it was provided, in substance, that the refusal or failure to perform the service contracted for, or to refund the money obtained, without just cause, should be *prima facie* evidence of the intent to injure or defraud.

But the refusal or failure to perform the service, without just cause, constitutes the breach of the contract. The justice of the grounds of refusal or failure must, of course, be determined by the contractual obligation as-

sumed. Whatever the reason for leaving the service, if, judged by the terms of the contract, it is insufficient in law, it is not "just cause." The money received and repayable, nothing more being shown, constitutes a mere debt. The asserted difficulty of proving the intent to injure or defraud is thus made the occasion for dispensing with such proof, so far as the *prima facie* case is concerned. And the mere breach of a contract for personal service, coupled with the mere failure to pay a debt which was to be liquidated in the course of such service, is made sufficient to warrant a conviction.

It is no answer to say that the jury must find, and here found, that a fraudulent intent existed. The jury by their verdict cannot add to the facts before them. If nothing be shown but a mere breach of a contract of service and a mere failure to pay a debt, the jury have nothing else to go upon, and the evidence becomes nothing more because of their finding. Had it not been for this statutory presumption, supplied by the amendment, no one would be heard to say that Bailey could have been convicted.

*Prima facie* evidence is sufficient evidence to outweigh the presumption of innocence and if not met by opposing evidence to support a verdict of guilty. "It is such as, in judgment of law, is sufficient to establish the fact; and, if not rebutted, remains sufficient for the purpose." *Kelly* v. *Jackson*, 6 Pet. 632.

We are not impressed with the argument that the Supreme Court of Alabama has construed the amendment to mean that the jury is not controlled by the presumption, if unrebutted, and still may find the accused not guilty. That court, in its opinion, said: "Again, it must be borne in mind that the rule of evidence fixed by the statute does not make it the duty of the jury to convict on the evidence referred to in the enactment, if unrebutted, whether satisfied thereby of the guilt of the accused beyond a reasonable doubt or not. On the con-

trary, with such evidence before them, the jury are still left free to find the accused guilty or not guilty, according as they may be satisfied of his guilt or not, by the whole evidence." 161 Alabama, 78.

But the controlling construction of the statute is the affirmance of this judgment of conviction. It is not sufficient to declare that the statute does not make it the *duty* of the jury to convict, where there is no other evidence but the breach of the contract and the failure to pay the debt. The point is that, in such a case, the statute *authorizes* the jury to convict. It is not enough to say that the jury may not accept that evidence as alone sufficient; for the jury may accept it, and they have the express warrant of the statute to accept is as a basis for their verdict. And it is in this light that the validity of the statute must be determined.

It is urged that the time and circumstances of the departure from service may be such as to raise not only an inference, but a strong inference, of fraudulent intent. There was no need to create a statutory presumption and it was not created for such a case. Where circumstances are shown permitting a fair inference of fraudulent purpose, the case falls within the rule of *Ex parte Riley (supra)* which governed prosecutions under the statute before the amendment was made. The "difficulty," which admittedly the amendment was intended to surmount, did not exist where natural inferences sufficed. Plainly the object of the statute was to hit cases which were destitute of such inferences, and to provide that the mere breach of the contract and the mere failure to pay the debt might do duty in their absence.

While in considering the natural operation and effect of the statute, as amended, we are not limited to the particular facts of the case at the bar, they present an illuminating illustration. We may briefly restate them. Bailey made a contract to work for a year at $12 a month. He

received $15 and he was to work this out, being entitled monthly only to $10.75 of his wages. No one was present when he made the contract but himself and the manager of the employing company. There is not a particle of evidence of any circumstance indicating that he made the contract or received the money with any intent to injure or defraud his employer. On the contrary, he actually worked for upwards of a month. His motive in leaving does not appear, the only showing being that it was without legal excuse and that he did not repay the money received. For this he is sentenced to a fine of $30 and to imprisonment at hard labor in default of the payment of the fine and costs for 136 days. Was not the case the same in effect as if the statute had made it a criminal act to leave the service without just cause and without liquidating the debt? To say that he has been found guilty of an intent to injure or defraud his employer, and not merely for breaking his contract and not paying his debt, is a distinction without a difference to Bailey.

Consider the situation of the accused under this statutory presumption. If at the outset nothing took place but the making of the contract and the receipt of the money, he could show nothing else. If there was no legal justification for his leaving his employment, he could show none. If he had not paid the debt there was nothing to be said as to that. The law of the State did not permit him to testify that he did not intend to injure or defraud. Unless he were fortunate enough to be able to command evidence of circumstances affirmatively showing good faith, he was helpless. He stood, stripped by the statute of the presumption of innocence, and exposed to conviction for fraud upon evidence only of breach of contract and failure to pay.

It is said that we may assume that a fair jury would convict only where the circumstances sufficiently indicated a fraudulent intent. Why should this be assumed

in the face of the statute and upon this record? In the present case the jury did convict, although there is an absence of evidence sufficient to establish fraud under the familiar rule that fraud will not be presumed, and the obvious explanation of the verdict is that the trial court in accordance with the statute charged the jury that refusal to perform the service, or to repay the money, without just cause, constituted *prima facie* evidence of the commission of the offense which the statute defined. That is, the jury were told in effect that the evidence, under the statutory rule, was sufficient, and hence they treated it as such. There is no basis for an assumption that the jury would have acted differently if Bailey had worked for three months, or six months, or nine months, if in fact his debt had not been paid. The normal assumption is that the jury will follow the statute and, acting in accordance with the authority it confers, will accept as sufficient what the statute expressly so describes.

It may further be observed that under the statute there is no punishment for the alleged fraud if the service is performed or the money refunded. If the service is rendered in liquidation of the debt there is no punishment, and if it is not rendered and the money is not refunded that fact alone is sufficient for conviction. By a statute passed by the legislature of Alabama in 1901 it was made a misdemeanor for any person, who had made a written contract to labor for or serve another for any given time, to leave the service before the expiration of the contract and without the consent of the employer, and to make a second contract of similar nature with another person without giving the second employer notice of the existence of the first contract. This was held unconstitutional upon the ground that it interfered with freedom of contract. *Toney* v. *The State*, 141 Alabama, 120. But, judging it by its necessary operation and obvious effect, the fundamental purpose plainly was to compel, under the sanction

of the criminal law, the enforcement of the contract for personal service, and the same purpose, tested by like criteria, breathes despite its different phraseology through the amendments of 1903 and 1907 of the statute here in question.

We cannot escape the conclusion that, although the statute in terms is to punish fraud, still its natural and inevitable effect is to expose to conviction for crime those who simply fail or refuse to perform contracts for personal service in liquidation of a debt, and judging its purpose by its effect that it seeks in this way to provide the means of compulsion through which performance of such service may be secured. The question is whether such a statute is constitutional.

This court has frequently recognized the general power of every legislature to prescribe the evidence which shall be received, and the effect of that evidence in the courts of its own government. *Fong Yue Ting* v. *United States,* 149 U. S. 698, 749. In the exercise of this power numerous statutes have been enacted providing that proof of one fact shall be *prima facie* evidence of the main fact in issue; and where the inference is not purely arbitrary and there is a rational relation between the two facts, and the accused is not deprived of a proper opportunity to submit all the facts bearing upon the issue, it has been held that such statutes do not violate the requirements of due process of law. *Adams* v. *New York,* 192 U. S. 585; *Mobile, Jackson & Kansas City Railroad Co.* v. *Turnipseed,* decided December 19, 1910, *ante,* p. 35.

The latest expression upon this point is found in the case last cited, where the court, by Mr. Justice Lurton, said: "That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact

presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to pre-clude the party from the right to present his defense to the main fact thus presumed. If a legislative provision not unreasonable in itself prescribing a rule of evidence, in either criminal or civil cases, does not shut out from the party affected a reasonable opportunity to submit to the jury in his defense all of the facts bearing upon the issue, there is no ground for holding that due process of law has been denied him."

In this class of cases where the entire subject-matter of the legislation is otherwise within state control, the question has been whether the prescribed rule of evidence interferes with the guaranteed equality before the law or violates those fundamental rights and immutable principles of justice which are embraced within the conception of due process of law. But where the conduct or fact, the existence of which is made the basis of the statutory presumption, itself falls within the scope of a provision of the Federal Constitution, a further question arises. It is apparent that a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a means of escape from constitutional restrictions. And the State may not in this way interfere with matters withdrawn from its authority by the Federal Constitution or subject an accused to conviction for conduct which it is powerless to proscribe.

In the present case it is urged that the statute as amended, through the operation of the presumption for which it provides, violates the Thirteenth Amendment of the Constitution of the United States and the act of Congress passed for its enforcement.

The Thirteenth Amendment provides:

"SECTION 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"SECTION 2. Congress shall have power to enforce this article by appropriate legislation."

Pursuant to the authority thus conferred, Congress passed the act of March 2, 1867, c. 187, 14 Stat. 546, the provisions of which are now found in §§ 1990 and 5526 of the Revised Statutes, as follows:

"SEC. 1990. The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in the Territory of New Mexico, or in any other Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of the Territory of New Mexico, or of any other Territory or State, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void."

"SEC. 5526. Every person who holds, arrests, returns, or causes to be held, arrested, or returned, or in any manner aids in the arrest or return of any person to a condition of peonage, shall be punished by a fine of not less than one thousand nor more than five thousand dollars, or by imprisonment not less than one year nor more than five years, or by both."

The language of the Thirteenth Amendment was not new. It reproduced the historic words of the ordinance of 1787 for the government of the Northwest Territory and gave them unrestricted application within the United States and all places subject to their jurisdiction. While the immediate concern was with African slavery, the

Amendment was not limited to that. It was a charter of universal civil freedom for all persons, of whatever race, color or estate, under the flag.

The words involuntary servitude have a "larger meaning than slavery." "It was very well understood that in the form of apprenticeship for long terms, as it had been practiced in the West India Islands, on the abolition of slavery by the English government, or by reducing the slaves to the condition of serfs attached to the plantation, the purpose of the article might have been evaded, if only the word slavery had been used." *Slaughter House Cases,* 16 Wall. p. 69. The plain intention was to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit which is the essence of involuntary servitude.

While the Amendment was self-executing, so far as its terms were applicable to any existing condition, Congress was authorized to secure its complete enforcement by appropriate legislation. As was said in the *Civil Rights cases:* "By its own unaided force and effect it abolished slavery, and established universal freedom. Still, legislation may be necessary and proper to meet all the various cases and circumstances to be affected by it, and to prescribe proper modes of redress for its violation in letter or spirit. And such legislation may be primary and direct in its character; for the Amendment is not a mere prohibition of state laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." 109 U. S. 20.

The act of March 2, 1867 (Rev. Stat., §§ 1990, 5526, *supra*), was a valid exercise of this express authority. *Clyatt* v. *United States,* 197 U. S. 207. It declared that all laws of any State, by virtue of which any attempt should be made "to establish, maintain, or enforce, directly or

indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise," should be null and void.

Peonage is a term descriptive of a condition which has existed in Spanish America, and especially in Mexico. The essence of the thing is compulsory service in payment of a debt. A peon is one who is compelled to work for his creditor until his debt is paid. And in this explicit and comprehensive enactment, Congress was not concerned with mere names or manner of description, or with a particular place or section of the country. It was concerned with a fact, wherever it might exist; with a condition, however named and wherever it might be established, maintained or enforced.

The fact that the debtor contracted to perform the labor which is sought to be compelled does not withdraw the attempted enforcement from the condemnation of the statute. The full intent of the constitutional provision could be defeated with obvious facility if, through the guise of contracts under which advances had been made, debtors could be held to compulsory service. It is the compulsion of the service that the statute inhibits, for when that occurs the condition of servitude is created, which would be not less involuntary because of the original agreement to work out the indebtedness. The contract exposes the debtor to liability for the loss due to the breach, but not to enforced labor. This has been so clearly stated by this court in the case of *Clyatt, supra,* that discussion is unnecessary. The court there said:

"The constitutionality and scope of sections 1990 and 5526 present the first questions for our consideration. They prohibit peonage. What is peonage? It may be defined as a status or condition of compulsory service, based upon the indebtedness of the peon to the master. The basal fact is indebtedness. As said by Judge Benedict, delivering the opinion in *Jaremillo* v. *Romero,* 1 N. Mex.

190, 194: 'One fact existed universally; all were indebted to their masters. This was the cord by which they seemed bound to their masters' service.' Upon this is based a condition of compulsory service. Peonage is sometimes classified as voluntary or involuntary, but this implies simply a difference in the mode of origin, but none in the character of the servitude. The one exists where the debtor voluntarily contracts to enter the service of his creditor. The other is forced upon the debtor by some provision of law. But peonage, however created, is compulsory service, involuntary servitude. The peon can release himself therefrom, it is true, by the payment of the debt, but otherwise the service is enforced. A clear distinction exists between peonage and the voluntary performance of labor or rendering of services in payment of a debt. In the latter case the debtor, though contracting to pay his indebtedness by labor or service, and subject like any other contractor to an action for damages for breach of that contract, can elect at any time to break it, and no law or force compels performance or a continuance of the service. We need not stop to consider any possible limits or exceptional cases, such as the service of a sailor, *Robertson* v. *Baldwin*, 165 U. S. 275, or the obligations of a child to its parents, or of an apprentice to his master, or the power of the legislature to make unlawful and punish criminally an abandonment by an employé of his post of labor in any extreme cases. That which is contemplated by the statute is compulsory service to secure the payment of a debt." 197 U. S. pp. 215, 216.

The act of Congress, nullifying all state laws by which it should be attempted to enforce the "service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise," necessarily embraces all legislation which seeks to compel the service or labor by making it a crime to refuse or fail to perform it. Such laws would furnish the readiest means of compulsion. The Thirteenth

Amendment prohibits involuntary servitude except as punishment for crime. But the exception, allowing full latitude for the enforcement of penal laws, does not destroy the prohibition. It does not permit slavery or involuntary servitude to be established or maintained through the operation of the criminal law by making it a crime to refuse to submit to the one or to render the service which would constitute the other. The State may impose involuntary servitude as a punishment for crime, but it may not compel one man to labor for another in payment of a debt, by punishing him as a criminal if he does not perform the service or pay the debt.

. If the statute in this case had authorized the employing company to seize the debtor and hold him to the service until he paid the fifteen dollars, or had furnished the equivalent in labor, its invalidity would not be questioned. It would be equally clear that the State could not authorize its constabulary to prevent the servant from escaping and to force him to work out his debt. But the State could not avail itself of the sanction of the criminal law to supply the compulsion any more than it could use or authorize the use of physical force. "In contemplation of the law the compulsion to such service by the fear of punishment under a criminal statute is more powerful than any guard which the employer could station." *Ex parte Hollman* (S. Car.), 60 S. E. Rep. 24.

What the State may not do directly it may not do indirectly. If it cannot punish the servant as a criminal for the mere failure or refusal to serve without paying his debt, it is not permitted to accomplish the same result by creating a statutory presumption which upon proof of no other fact exposes him to conviction and punishment. Without imputing any actual motive to oppress, we must consider the natural operation of the statute here in question (*Henderson* v. *Mayor*, 92 U. S. p. 268), and it is apparent that it furnishes a convenient instrument for the coer-

cion which the Constitution and the act of Congress forbid; an instrument of compulsion peculiarly effective as against the poor and the ignorant, its most likely victims. There is no more important concern than to safeguard the freedom of labor upon which alone can enduring prosperity be based. The provisions designed to secure it would soon become a barren form if it were possible to establish a statutory presumption of this sort and to hold over the heads of laborers the threat of punishment for crime, under the name of fraud but merely upon evidence of failure to work out their debts. The act of Congress deprives of effect all legislative measures of any State through which directly or indirectly the prohibited thing, to wit, compulsory service to secure the payment of a debt may be established or maintained; and we conclude that § 4730, as amended, of the Code of Alabama, in so far as it makes the refusal or failure to perform the act or service, without refunding the money or paying for the property received, *prima facie* evidence of the commission of the crime which the section defines, is in conflict with the Thirteenth Amendment and the legislation authorized by that Amendment, and is therefore invalid.

In this view it is unnecessary to consider the contentions which have been made under the Fourteenth Amendment. As the case was given to the jury under instructions which authorized a verdict in accordance with the statutory presumption, and the opposing instructions requested by the accused were refused, the judgment must be reversed.

*Reversed and cause remanded for further proceedings not inconsistent with this opinion.*

MR. JUSTICE HOLMES, with whom concurred MR. JUSTICE LURTON, dissenting.

WE all agree that this case is to be considered and decided in the same way as if it arose in Idaho or New York.

Neither public document nor evidence discloses a law
which by its administration is made something different
from what it appears on its face, and therefore the fact
that in Alabama it mainly concerns the blacks does not
matter. *Yick Wo* v. *Hopkins*, 118 U. S. 356, does not
apply. I shall begin then by assuming for the moment
what I think is not true and shall try to show not to be
true, that this statute punishes the mere refusal to labor
according to contract as a crime, and shall inquire whether
there would be anything contrary to the Thirteenth
Amendment or the statute if it did, supposing it to have
been enacted in the State of New York. I cannot believe
it. The Thirteenth Amendment does not outlaw con-
tracts for labor. That would be at least as great a mis-
fortune for the laborer as for the man that employed him.
For it certainly would affect the terms of the bargain un-
favorably for the laboring man if it were understood that
the employer could do nothing in case the laborer saw
fit to break his word. But any legal liability for breach
of a contract is a disagreeable consequence which tends to
make the contractor do as he said he would. Liability to
an action for damages has that tendency as well as a fine.
If the mere imposition of such consequences as tend to
make a man keep to his promise is the creation of peonage
when the contract happens to be for labor, I do not see why
the allowance of a civil action is not, as well as an indict-
ment ending in fine. Peonage is service to a private
master at which a man is kept by bodily compulsion
against his will. But the creation of the ordinary legal
motives for right conduct does not produce it. Breach
of a legal contract without excuse is wrong conduct, even
if the contract is for labor, and if a State adds to civil
liability a criminal liability to fine, it simply intensifies
the legal motive for doing right, it does not make the
laborer a slave.

But if a fine may be imposed, imprisonment may be

imposed in case of a failure to pay it. Nor does it matter if labor is added to the imprisonment. Imprisonment with hard labor is not stricken from the statute books. On the contrary, involuntary servitude as a punishment for crime is excepted from the prohibition of the Thirteenth Amendment in so many words. Also the power of the States to make breach of contract a crime is not done away with by the abolition of slavery. But if breach of contract may be made a crime at all, it may be made a crime with all the consequences usually attached to crime. There is produced a sort of illusion if a contract to labor ends in compulsory labor in a prison. But compulsory work for no private master in a jail is not peonage. If work in a jail is not condemned in itself, without regard to what the conduct is it punishes, it may be made a consequence of any conduct that the State has power to punish at all. I do not blink the fact that the liability to imprisonment may work as a motive when a fine without it would not, and that it may induce the laborer to keep on when he would like to leave. But it does not strike me as an objection to a law that it is effective. If the contract is one that ought not to be made, prohibit it. But if it is a perfectly fair and proper contract, I can see no reason why the State should not throw its weight on the side of performance. There is no relation between its doing so in the manner supposed and allowing a private master to use private force upon a laborer who wishes to leave.

But all that I have said so far goes beyond the needs of the case as I understand it. I think it a mistake to say that this statute attaches its punishment to the mere breach of a contract to labor. It does nor purport to do so; what it purports to punish is fraudulently obtaining money by a false pretense of an intent to keep the written contract in consideration of which the money is advanced. (It is not necessary to cite cases to show that such an in-

tent may be the subject of a material false representation.)
But the import of the statute is supposed to be changed
by the provision that a refusal to perform, coupled with
a failure to return the money advanced, shall be *prima
facie* evidence of fraudulent intent. I agree that if the
statute created a conclusive presumption it might be
held to make a disguised change in the substantive law.
*Keller* v. *United States*, 213 U. S. 138, 150. But it only
makes the conduct *prima facie* evidence, a very different
matter. Is it not evidence that a man had a fraudulent
intent if he receives an advance upon a contract over
night and leaves in the morning? I should have thought
that it very plainly was. Of course the statute is in gen-
eral terms and applies to a departure at any time with-
out excuse or repayment, but that does no harm except
on a tacit assumption that this law is not administered
as it would be in New York, and that juries will act with
prejudice against the laboring man. For *prima facie*
evidence is only evidence, and as such may be held by
the jury insufficient to make out guilt. 161 Alabama, 78.
This was decided by the Supreme Court of Alabama in
this case, and we should be bound by their construction
of the statute, even if we thought it wrong. But I venture
to add that I think it entirely right. *State* v. *Intoxicating
Liquors*, 80 Maine, 57. This being so, I take it that a
fair jury would acquit, if the only evidence were a de-
parture after eleven months' work, and if it received no
color from some special well-known course of events.
But the matter well may be left to a jury, because their
experience as men of the world may teach them that in
certain conditions it is so common for laborers to remain
during a part of the season, receiving advances, and then
to depart at the period of need in the hope of greater
wages at a neighboring plantation, that when a laborer
follows that course there is a fair inference of fact that
he intended it from the beginning. The Alabama stat-

ute, as construed by the state court and as we must take it, merely says, as a court might say, that the prosecution may go to the jury. This means and means only that the court cannot say, from its knowledge of the ordinary course of events, that the jury could not be justified by its knowledge in drawing the inference from the facts proved. In my opinion the statute embodies little if anything more than what I should have told the jury was the law without it. The right of the State to regulate laws of evidence is admitted, and the statute does not go much beyond the common law. *Commonwealth* v. *Rubin,* 165 Massachusetts, 453.

I do not see how the result that I have reached thus far is affected by the rule laid down by the court, but not contained in the statute, that the prisoner cannot testify to his uncommunicated intentions, and therefore, it is assumed, would not be permitted to offer a naked denial of an intent to defraud. If there is an excuse for breaking the contract it will be found in external circumstances, and can be proved. So the sum of the wrong supposed to be inflicted is that the intent to go off without repaying may be put further back than it would be otherwise. But if there is a wrong it lies in leaving the evidence to the jury, a wrong that is not affected by the letting in or keeping out an item of evidence on the other side. I have stated why I think it was not a wrong.

To sum up, I think that obtaining money by fraud may be made a crime as well as murder or theft; that a false representation, expressed or implied, at the time of making a contract of labor that one intends to perform it and thereby obtaining an advance, may be declared a case of fraudulently obtaining money as well as any other; that if made a crime it may be punished like any other crime, and that an unjustified departure from the promised service without repayment may be declared a sufficient case to go to the jury for their judgment; all without in any

way infringing the Thirteenth Amendment or the statutes of the United States.

MR. JUSTICE LURTON concurs in this dissent.